USDC SCAN INDEX SHEET

















CAG    1/17/01    8:40

3:99-CR-02143   USA V. SCHNEIDER

*77*

*CRMEMSUP.*

JANICE M. DEATON
Attorney at Law
#135188
2366 Front Street
San Diego, CA 92101
Telephone: (619) 231-1107

FILED

01 JAN 16 PM 4:18

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

Attorney for Defendant
NOREEN SCHNEIDER-RUCINSKI

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### (HONORABLE MARILYN L. HUFF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 99cr2143-H |
| Plaintiff, | ) | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO WITHDRAW PLEA OF GUILTY** |
| vs. | ) | |
| NOREEN SCHNEIDER-RUCINSKI, | ) | DATE: January 29, 2001 |
| Defendant. | ) | TIME: 9:00 a.m. |

## I

## STATEMENT OF THE FACTS

On February 18, 2000, Noreen Schneider-Rucinski entered a guilty plea in front of this Court pursuant to a plea agreement. The plea agreement was a "package deal," in which Ms. Schneider-Rucinski pled guilty along with her father, Jerome Schneider. Pursuant to the plea agreement, the government will recommend a sentence of three years probation with six months home detention.

The plea colloquy did not go smoothly in this case. Indeed, the Court had to take a recess because it was unable to obtain a factual basis from Ms. Schneider-Rucinski. Following the recess, her attorney, Frank Vecchione, gave the factual basis for his client.

Mr. Vecchione:    As we discussed this morning, in late 1994, Ms. Schneider-Rucinski became a sales representative for her father's company, Computerized Medical, which – and acted as the representative for the company at La Jolla White Sands and



Escondido Gardens in securing contracts for the delivery of adult diapers.

In late October, 1994, she learned from her father that those diapers could no longer be delivered and covered by Medicare billings – by letter, that they no longer were covered by Medicare billings and that to continue any delivery or receipt of payment at that point in time would be illegal. She failed to disclose that to Medicare at the time.

Two weeks later, Ms. Rucinski received a commission check from her father on approximately November 14, which gave her notice that the billing was continuing. She intentionally failed to disclose that to Medicare with the intent to aid in the continued billing for the diapers. She continued to receive a total of approximately $30,000 in commissions over the next three months, and at no time did she contact Medicare.

## II

## ARGUMENT

## APPLICABLE STANDARDS FOR WITHDRAWAL OF PLEA

Prior to the adoption of the Fed. R. Crim. P. 32(e), the Supreme Court held that "On timely application, the court will vacate a plea of guilty shown to have been . . . given through ignorance, fear or inadvertence." Kercheval v. United States, 274 U.S. 220, 224 (1927). "The court in exercise of its discretion will permit one accused to substitute a plea of not guilty and have a trial if for any reason the granting of the privilege seems fair and just." Kercheval, supra, 274 U.S. at 224.

Since Kercheval, case law has developed general rules governing motions to withdraw pleas. While permission to withdraw is committed to the sound discretion of the court, e.g, United States v. Alber, 56 F.3d 1106, 1111 (9th Cir. 1995); United States v. Navarro-Flores, 628 F. 2d 1178, 1183 (9th Cir. 1980); Fed. R. Crim. P. 32(e) imposes no limitation upon the withdrawal of a plea of guilty before sentencing. The case law requires the defendant to show a fair and just reason for the withdrawal.

### A.    The Withdrawal of a Plea Before Sentencing

Rule 32(e), Federal Rules of Criminal Procedure, provides: "If a motion for withdrawal of a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit withdrawal of the

1  plea upon a showing by the defendant of any fair and just reason." See also, <u>United States v. Hyde</u>, 520

2  U.S. 670, 671 (1997)

3        Although a defendant does not have an absolute right to withdraw a guilty plea (see, <u>United

4  States v. Pluta</u>, 114 F.3d 968, 973 (6th Cir.) <u>cert. denied</u> 119 S.Ct. 266 (1998)), the Ninth Circuit has

5  held the withdrawal of a plea of guilty should be freely granted before sentence when there is a fair and

6  just reason for doing so.  <u>United States v. King</u>, 618 F.2d 550 (9th Cir. 1980); <u>United States v. Read</u>, 534

7  F.2d 858 (9th Cir. 1976);  <u>United States v. Webster</u>, 468 F.2d 769, 771 (9th Cir. 1972), <u>cert. denied</u>, 410

8  U.S. 934 (1973);  <u>Kadwell v. United States</u>, 315 F.2d 667, 670-671 (9th Cir. 1963).   A motion to

9  withdraw a guilty plea protects the right of the defendant to a trial; therefore, such request made before

10  sentencing should be construed liberally in favor of the defendant. <u>United States v. Strayton</u>, 408 F.2d

11  559 (9th Cir. 1969). A defendant has the burden of proving a fair and just reason to withdraw the plea.

12        "Before sentencing, the inconvenience to court and prosecution resulting from a change of plea

13  is ordinarily slight as compared with the public interest in protecting the right of the accused to trial by

14  jury." <u>Kadwell v. United States</u>, <u>supra</u>, 315 F.2d at 670. Fed. R. Crim. P. 32(e) distinguishes withdrawal

15  of a plea before and after sentence. The standard governing withdrawal of a plea after sentence has been

16  imposed is therefore more exacting.   If a plea of guilty could be "retracted with ease <u>after</u> sentence, the

17  accused might be encouraged to plead guilty to test the weight of potential punishment, and withdraw

18  the plea if the sentence were unexpectedly severe." <u>Kadwell v. United States</u>, <u>supra</u>, 315 F.2d at 670

19  (emphasis added).   A plea may be withdrawn after sentence only to correct "manifest injustice" <u>United

20  States v. Nagra</u>, 147 F.3d 875, 880 (9th Cir. 1998); <u>United States v. Pearson</u>, 483 F.2d 809, 810-811

21  (9th Cir. 1973).

22        In the instant case, Mr. Schneider-Rucinski has not yet been sentenced. Thus, the "fair and just

23  reason" standard applies. Furthermore, because the presentence report has not yet been reviewed by Ms.

24  Schneider-Rucinski, she has no idea what sentence the Probation department is recommending.  Ms.

25  Schneider-Rucinski seeks to withdraw her plea of guilty and go to trial, and contends that there are

26  eminently fair and just reasons, infra, for the court to exercise its discretion in this matter and grant her

27  motion.

28

**B.**   <u>Being Legally Innocent of a Crime is a Fair and Just Reason to Withdraw a Guilty Plea</u>

In deciding the merits of a motion to withdraw a guilty plea, courts have utilized various factors to assist in their decision.  Important factors to be considered include:

1)   Whether the motion was brought prior to sentencing;

2)   The amount of time that elapsed between the plea and the motion to withdraw it;

3)   Whether the defendant has asserted or maintained his or her innocence;

4)   The plausibility and weight of the proffered reason;

5)   Defendant's ability to fully comprehend the charges;

6)   Whether plea was made knowingly and intelligently;

7)   Any possible coercive influence;

8)   Prejudice to government.

See, <u>United States v. Santiago</u>, 200 WL 1483720 (1st Cir. 2000); <u>United States v. Nagra</u>, <u>supra</u>, 147 F.3d at 880; <u>United States v. Bashara</u>, 27 F.3d 1174, 1181 (6th Cir. 1994); <u>United States v. Parilla-Tirado</u>, 22 F.3d 368 (1st Cir. 1994); <u>United States v. Daniels</u>, 821 F.2d 76 (1st Cir. 1987);  <u>United States v. Lambordozzi</u>, 436 F.2d 878, 881 (2nd Cir.), <u>cert</u>. <u>denied</u>, 402 U.S. 908 (1971);   <u>Kadwell v. United States</u>, <u>supra</u>; <u>Leonard v. United States</u>, 231 F.2d 588 (5th Cir. 1956).

In applying these factors to this case, Ms. Schneider-Rucinski has carried her burden in showing a fair and just reason to permit her to withdraw her guilty plea.

**1.**   **Whether the Motion was Filed Before Sentencing**

As indicated above, this motion has been filed prior to Ms. Schneider-Rucinski's sentencing. Additionally, Ms. Schneider-Rucinski has not read her presentence report and is unaware of what Probation Officer Botts has recommended.  Ms. Schneider-Rucinski is aware that, under the plea agreement, she was to receive a probationary type of sentence if the Court followed the plea agreement. Thus, Ms. Schneider-Rucinski is not filing this motion out of fear she will receive a higher prison term than was expected.  See <u>Kadwell v. United States</u>, <u>supra</u>, 315 F.2d at 670.

**2.**   **The Timeliness of the Motion**

Regarding the timing of this motion, one week after entering of her guilty plea, Ms. Schneider-Rucinski indicated her desire to withdraw this plea. (See Declaration of Attorney Frank T. Vecchione,

1    attached hereto as Exhibit "B") Although she was interviewed by the probation officer, her attorney at

2    the time advised Ms. Schneider-Rucinski to cease the interview and to submit a letter to the probation

3    officer, Susan Botts, at a later time.  Instead of doing so, Ms. Schneider-Rucinski has elected to file this

4    motion to withdraw her guilty plea.  The basis for her withdrawal is her innocence.  Although it has been

5    almost a year since the entry of her plea, there have been numerous continuances due to her father and

6    co-defendant's health and the death in her prior attorney's family.  Ms. Schneider-Rucinski has had to

7    find new counsel to file this motion.  (See, Exhibit B, Declaration of Frank T. Vecchione.)  Her current

8    attorney was retained in the middle of November and appeared before this Court for the first time on

9    November 20, 2000.

10       **3.      Ms. Schneider-Rucinski Asserts Her Innocence**

11       "Courts look more hospitably on a motion to withdraw a guilty plea when the motion is coupled

12   with an assertion of innocence. . . " United States v. Gonzalez, 202 F.3d 20, 24 (1st Cir. 2000).  In

13   United States v. Gomez-Orozco, the court held innocence of a crime is a fair and just reason to withdraw

14   a guilty plea.  United States v. Gomez-Orozco, 188 F.3d 422, 425 (7th Cir. 1999).  The claim must be

15   supported by credible evidence of her innocence.  Ibid.  When a defendant seeks to withdraw his or her

16   guilty plea on a claim of legal innocence, the district court has three options: (1) It can permit the

17   withdrawal of the plea and let the defendant go to trial; (2) it can conduct an evidentiary hearing on the

18   matter; or (3) it can deny the motion with an explanation as to why the evidence is insufficient or

19   incredible.  Ibid., citing United States v. Groll, 992 F.2d 755, 758 (7th Cir. 1993).  The investigation in

20   this case began in Florida, where Jerome Schneider resided.  The events surrounding this case occurred

21   principally in 1994.  Although seven to ten people worked for Jerome Schneider in this fraudulent scheme

22   in Florida, none of them have been indicted.  There were several witnesses brought before the grand jury

23   from Florida, who had ample experience in Medicare sales, none of whom were indicted, none of whom

24   had to pay restitution.  Further, no changes have ever been filed against anyone in Florida.

25       For several months prior to her guilty plea, Ms. Schneider-Rucinski believed her father would be

26   filing an Eccles affidavit exonerating her. (See Declaration of Noreen Schneider-Rucinski, attached hereto

27   as Exhibit "A".)  Rather than exonerate his daughter, however, Mr. Schneider obtained the most

28   favorable plea agreement he could for himself.  Following Ms. Schneider-Rucinski's guilty plea, she asked

1  her father to write a letter in support of her motion to withdraw it. Attached to this motion is a letter

2  written to her from her father, Jerome Schneider, on August 2, 2000. This letter sets out the details of

3  Ms. Schneider-Rucinski's working relationship with her father; the reasons for payment after October,

4  1994; and the fact that Ms. Schneider-Rucinski is "strictly a sales representative." (August 2, 2000,

5  letter, attached hereto as Exhibit "C") This letter also explains that Ms. Schneider-Rucinski believed the

6  checks received by her in November of 1994 were legally provided. In the fourth paragraph of Mr.

7  Schneider's letter, he explains, "After review and information from outside authorized Medicare

8  specialists, . . . and calls with the Inspector General in November of 1994, it was determined by CMC

9  that is [sic] still authorized to be billed. From this information, I continued to tell Noreen even after the

10  October 29, 1994, letter that I sent her that CMC was still authorized to bill. . . ." (See, Exhibit "C")

11    This August 2, 2000, letter did not exist at the time Ms. Schneider-Rucinski entered her guilty

12  plea on February 18, 2000. See, United States v. Turner, 898 F.2d 705, 713 (9th Cir. 1990) (intervening

13  circumstances or newly discovered evidence that did not exist when he pleaded guilty may be grounds

14  for a withdrawal). In addition to the August 2 letter from her father, Ms. Schneider-Rucinski discovered

15  certain contracts which were on the hard drive of a computer which Ms. Schneider-Rucinski had in

16  storage. ("Computerized Medical Consultant Services and Commission/Fees Agreement") Once Ms.

17  Schneider-Rucinski discovered and reviewed these contracts, she recalled why she would receive checks

18  following October, 1994.[1]  Along with the contract between the Computerized Medical Consultant

19  Services and Ms. Schneider-Rucinski, there was an Agent Agreement. (The Contracts and the Agent

20  Agreement are attached hereto as Exhibit "D"). Paragraph VIII, Post Termination Commissions,

21  indicates Ms. Schneider-Rucinski would be paid for three to six months following the last payment of the

22  patient's services, *even if services to the patients were to stop.* (See ¶ VIII, "Should services stop, the

23  monthly fee of $3,500 to agent and to all associates will be paid for three to six months following last

24  payment of patient's services.") This Agents Agreement demonstrates Ms. Schneider-Rucinski could have

25  received and did receive these checks pursuant to the contract and not pursuant to any continued billing,

26  at least to her knowledge, by her father to Medicare.

27    In addition to the above evidence of Ms. Schneider-Rucinski's innocence, she will present the

28

---

[1]  It is important to remember these events occurred over five years ago.

8

1    testimony of her brother, Mark Schneider, at the evidentiary hearing on January 29, 2001.   Mark

2    Schneider will testify that his father, Jerome, had said he would exonerate Ms. Schneider-Rucinski, that

3    at all costs Ms. Schneider-Rucinski would have his complete cooperation for making sure the government

4    knew the truth about her innocence, and that Jerome Schneider would inform the Court and the

5    government that at no time did the defendant know the Medicare rules and had no access to them as she

6    did not know the codes or any information as to how CMC was billing for the pouches.   Most

7    importantly, Mark Schneider would testify he was present on numerous occasions when Jerome

8    Schneider called Ms. Schneider-Rucinski and reinforced to her the appropriateness of CMC's billing

9    dealings with Medicare and their patients.

10          Ms. Schneider-Rucinski made no money from her job with her father at CMC.   She refunded

11    $25,000 to her father.   Additionally, she paid an associate several thousand dollars out of her own pocket.

12    Ms. Schneider-Rucinski should be permitted to withdraw her guilty plea.

13          **4.     There is no Prejudice to the Government**

14          A final factor which weighs heavily in favor of defendant, as well, is the lack of any prejudice to

15    the government should this plea be ordered withdrawn.   All witnesses and evidence should still be

16    available for presentation at trial with no impairment or prejudice to the government's case.   The absence

17    of any prejudice to the government is a critical factor which weighs heavily in factor of a defendant

18    moving to withdraw his plea prior to sentencing.   See United States v. Savage, 561 F.2d 554 (4th Cir.

19    1977).

20          **C.     This Court Should Grant an Evidentiary Hearing**

21          Ms. Schneider-Rucinski has presented credible evidence showing her innocence.   If this Court

22    does not permit the withdrawal of the plea, Ms. Schneider-Rucinski requests an evidentiary hearing on

23    the matter.   See, United States v. Gomez-Orozco, supra, 188 F.3d at 425.   At the evidentiary hearing,

24    Ms. Schneider-Rucinski will amplify the evidence presented herein.

25    ///

26    ///

27    ///

28    ///

## CONCLUSION

For the foregoing reasons, Noreen Schneider-Rucinski requests this Court grant her motion to withdraw her guilty plea.

DATED:  January 15, 2001                          Respectfully submitted,

_Jane Deaton_
JANICE M. DEATON
Attorney for Defendant
Noreen Schneider-Rucinski

JANICE M. DEATON
Attorney at Law
#135188
2366 Front Street
San Diego, CA 92101
Telephone: (619) 231-1107

Attorney for Defendant
NOREEN SCHNEIDER-RUCINSKI

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### (HONORABLE MARILYN L. HUFF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 99cr2143-H |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF NOREEN** |
| | ) | **SCHNEIDER-RUINSKI** |
| vs. | ) | |
| | ) | |
| NOREEN SCHNEIDER-RUCINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

I, NOREEN SCHNEIDER-RUCINSKI, declare as follows:

1.      I am the defendant in the above-entitled case.

2.      On February 18, 2000, I entered a guilty plea to Count Five of a five-count indictment charging me with aiding and abetting false statements and representations, in violation of 18 U.S.C. section 2 and 42 U.S.C. section 1320(a) through 7(b)(A)(3).

3.      Prior to my guilty plea, I had numerous discussions with my then-counsel, Frank T. Vecchione. Mr. Vecchione informed me the government was only offering a "package deal" for plea offer. I was informed that a package deal was directed by the government would only be presented to my father if I pleaded guilty as well. If I didn't plead guilty that he would not be able to receive the lighter sentencing that would aid him in his health conditions that was given to him in his plea barging.

4.      Mr. Vecchione discussed with me the pieces of evidence, which the government had and would rely upon at trial if I chose to go to trial. Although I felt there was an explanations for each piece of evidence, I understood there was a great risk in going to trial because I was told that it would be

1

EXHIBIT "A"

1   against my father and myself as a co-defendant.

2        Additionally, I was informed that my father, who had previously told me he would exonerate me,

3   had changed his mind and was considering offering evidence against me if I did not plead guilty to aid

4   him.

5        5.   Prior to entering my guilty plea on February 18, 2000, my father called me. He told me

6   that if I did not plead guilty with him that he would never win at trial and that he would go to jail.  He

7   informed my husband and me that I had to plead guilty and take the deal that he was being given since

8   it was package deal. He told me I needed to "get this thing through, whatever it took."

9        6.   I was extremely affected by the stress I was experiencing from both my family aspect well

10  as my personal emotional reservations and confusion.  Although I wanted to assert my innocence and go

11  to trial, I knew that I could not do this without my father also being forced to go to trial.  I therefore did

12  not feel I had a choice but to plead guilty.

13       7.   On the day of the entering my plea I still had my reservations, whenthe court took a

14  recess. Although I did not want to plead guilty, I did so because there was no other option.

15       8.   I called my attorney shortly thereafter and told him I wanted to withdraw my plea.  He

16  said to sleep on it and get back to him.  When he returned after a death in his family one week later, I

17  called and still indicated I wanted to withdrawal my guilt plea because I believe I am innocent of this

18  offense.  At the beginning of March, I met with Mr. Vecchione to discuss withdrawing my plea.

19       9.   As of the date of filing this motion, I have not reviewed the presentence report in my case.

20  I have no idea what the probation officer is recommending.  I do understand that the plea agreement

21  under which I entered my guilty plea to Count Five called for a government recommendation of

22  probation.

23       I declare under penalty of perjury that the foregoing is true and correct to the best of my

24  knowledge and belief.

25       Executed this 16th day of January, 2001, at San Diego, California.

26

27

28                        _____
                          NOREEN SCHNEIDER-RUCINSKI

2

1  **FRANK T. VECCHIONE**
   Attorney at Law
2  105 West "F" Street, Suite 215
   San Diego, California 92101
3  Telephone No. (619) 231-3653
   Facsimile No. (619) 239-0056
4  State Bar No.: 054730

5

6

7

8                   **UNITED STATES DISTRICT COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**
                        **(Hon.  Marilyn L. Huff)**
10
   UNITED STATES OF AMERICA,        )    CASE NO. 99CR2143-H
11                                   )
12              Plaintiff,           )
                                     )    **DECLARATION OF**
13                                   )    **FRANK T. VECCHIONE**
   vs.                               )
14                                   )
                                     )
15 NOREEN SCHNEIDER-RUCINSKI,        )
                                     )
16              Defendant.           )
                                     )
17                                   )
                                     )
18 ─────────────────────────────────)

   I, FRANK T. VECCHIONE, do depose and state:

19
        (1)    I am an attorney duly licensed to practice law before the United States
20
   Supreme Court, Southern District of California, Ninth Circuit Court of Appeals and all courts
21
   of the State of California;
22
        (2)    I was counsel of record for defendant NOREEN SCHNEIDER-RUCINSKI in
23
   the above-entitled matter at the time of her entry of guilty plea before this court on February
24
   18, 2000; at that time, Ms. Rucinski entered a plea to Count 5 of the Indictment, i.e., false
25
   representation to Medicare, in violation of Title 42 U.S.C. § 1320(a);
26
        (3)    The decision to enter a plea of guilty by Ms. Rucinski was clearly a difficult
27
   one and an emotional one right up to the time of the entry of the plea; in the days leading up
28

                                              EXHIBIT "B"

to the entry of the plea, various members of Ms. Rucinski's family contacted me expressing concern over her emotional state and the hope that Ms. Rucinski would agree to the probationary offer in order to get this matter behind her;

     (4)    On February 18, 2000, Ms. Rucinski entered a plea of guilty to Count 5 of the Indictment;

     (5)    Within days of the entry of the plea, the defendant contacted my office telephonically and left a message that she wished to withdraw her guilty plea; this counsel was out of town at the time and waited till return to San Diego to return the call;

     (6)    On March 6, 2000, this counsel discussed the matter with Ms. Rucinski; she indicated her desire to withdraw her guilty plea directly to me at that time; I advised her that I would need some time to research the issue as well as consider issues as they may pertain to any conflict of interest;

     (7)    On March 10, 2000, I once again discussed the issue of withdraw of guilty plea with Ms. Rucinski; she again reiterated her desire to withdraw the guilty plea;

     (8)    Shortly thereafter, I assisted in attempting to find new counsel for Ms. Rucinski with regard to her motion to withdraw guilty plea;

     (9)    I have at no time reviewed the presentence report prepared in this matter with Ms. Rucinski.

     I swear, under the penalty of perjury, the above to be true and correct to the best of my information and belief.

Dated:   January 16, 2001

FRANK T. VECCHIONE
Attorney at Law

**Noreen Rucinski**

| | |
|---|---|
| From: | "Noreen Rucinski" <noreenr@home.com> |
| To: | <Jer730@aol.com> |
| Sent: | Wednesday, August 02, 2000 10:58 PM |
| Attach: | Noreen Rucinski.vcf |

I asked my daughter in Aug of 94 to come to work for me as a salesperson for CMC. Her responsibly were to market the female collection units. I told her were authorized for CMC to supply and bill for the Medicare patients.

In Sept of 1994 the first order from Escondido Gardens came in and CMC billed shipped and delivered the items.

In October of 1994 I received a call from Luz at White Sands, this site was also set up on the collection units. The call was based on the amount Medicare was reimbursing to CMC for each Medicare patient, Luz said it looked extreme and requested the return of items and funds and no future orders. I sent Noreen a letter and directed Noreen to write her a letter indicating that if White Sands felt the service CMC was providing was not appropriate and unauthorized CMC would investigate it and return funds should that be warranted.

After review and information from outside authorized Medicare specialist, Medicare it's self and calls with the Inspector General in Nov of 1994, it was determined by CMC that is still authorized to be billed. From this information I continued to tell Noreen even after the Oct 29 1994 letter that I sent her that CMC was still Authorized to bill. After the October letter, a follow-up conversation Luz at White Sands by CMC indicating that once the merchandise was returned, that Medicare would be reimbursed.

Any further patient lists that were done with Escondido and CMC staff. If there was any papers between the facility and CMC it was not done by Noreen. CMC had several conversations and follow-up with Betty Verner at Escondido on who stilled needed supplies.

I want it to be known that at no point in time did I ever tell my daughter anything about the billing or procedures or the amounts reimbursed from Medicare. CMC office and staff in Florida did all the work. Nor was she aware of when CMC billed and what was reimbursed by Medicare.

She was strictly a sales representative. When she was confronted by several groups and told that it may not be billable, being her contracted employer I continued to tell her it was still allowable. I know she did checking on her own because I gave her several numbers to the billing people at Medicare, who I would have thought would have been the only one to inform her of the billing policies to confirm what Medicare had informed me of what was allowed or denied.

March of 95 based on good faith I informed Noreen that billing will no longer be allowed on the collection units and it was stopped. Again I informed her only in March as confirmation

8/3/00

EXHIBIT "C"

that it could no longer be billed, when Dmerk changed it's practices.

However, she was also contracted to work for another company that I was a minority share holder in. and when she wasn't paid from them I paid her . Her payments would have been started in Nov as well.

The payment for February of 95, was out of my pocket. Noreen had paid a salesrep that was working for CMC in California and I was making her whole on it. I did state it was for sales and commissions but it was to pay Noreen back funds she had done out of her pocket.

She later has returned all the funds to me that she has received when I requested of her.

COMPUTERIZED MEDICAL CONSULTANT
SERVICES AND COMMISSION/FEES
AGREEMENT

This Services Agreement is entered into as Aug 1 1994 (the **"Effective Date"**), by and between Computerized Medical Services, a Florida corporation (CMC), and Noreen Rucinski and or IFIP and associates. (IFIP)

**1.      INCORPORATION OF DOCUMENTS AND CONTROLLING PROVISIONS:**

1.1      This Service Agreement, together with **(a)** Service Orders (as defined in Section 2.1 of this Service Agreement) accepted by CMC pursuant to the terms hereof, and **(b)** schedules and exhibits incorporated herein by reference (**"Exhibits"**), shall be referred to collectively herein as this **"Agreement."** In the event of any conflict between the provisions of this Agreement and the terms of any Service Order(s) and/or Exhibit(s), the conflict shall be resolved by reference to said documents in the following order of priority of interpretation (except as is otherwise specifically provided in this Agreement or in any Exhibits): **(a)** any Service Order(s); **(b)** any Exhibit(s), with reference to the same in order of attachment to this Agreement; and **(c)** this Agreement. Notwithstanding the foregoing, no provision or term of any Service Order or Exhibit shall be a part of this Agreement or binding on IFIP unless and until such Service Order or document has been executed by an authorized representative of CMC.

1.2      If any provision of this Agreement conflicts with any statute, rule or order of any governmental unit or regulatory body, or filed by CMC, then, if required by law, this Agreement shall remain in effect but shall be automatically modified by such conflicting law, statute, rule, order or, subject to the termination rights granted herein.

**2.      SERVICES TO BE PROVIDED BY CMC**

2.1      **Provisioning, Ordering,** Delivery and Billing (including continuing & rebilling) to any Departments of the government or facilities, and all related services available are identified in the Service Exhibit attached hereto as "Collection Forms", which is incorporated by this reference (the **"Service Exhibit"**). Facilities requested by patient shall be requested on CMC's service order forms in effect from time to time (hereafter, any such order is a **"Service Order(s)"**). Each Service Order shall reference this Agreement and shall become a part of this Agreement when executed by a duly authorized representative of CMC only. CMC reserves the right to reject any Service Order.

2.2      Upon acceptance by CMC of a duly executed Service Order during the Term (as defined in Section 4.3 of this Agreement) of this Agreement, CMC shall provide to those Facilities identified in the Service Order, at no time will the representative be required to renew or amend the contract or documents.

**3.      TERM:**

3.1      This Agreement shall be effective between the parties monthly basis as of the date first written hereon. The initial term (the **"Initial Term"**) of this Agreement shall expire on the later of:  **(a)** six (6) month from the date of execution hereof, or **(b)** the expiration of the Minimum Service Term, as defined in Section 4.2 of the Service Exhibit; unless either party earlier terminates this Agreement in the manner provided herein.

4.4      Notwithstanding anything to the contrary in this Section 4, if the Facility Minimum Service Term (as set forth in Section 4.3 of the Service Exhibit) for a Facility or Facilities extends beyond the expiration of the Term of this Agreement, then this Agreement shall continue in effect until the expiration or termination of the applicable Facility Minimum Service Term, six (6) months, but only as to the Facility or Facilities so affected, and subject to the termination rights of CMC and Patient under Section 8 of this Agreement.

EXHIBIT "D-1"

Confidential and Proprietary

Jerome Schneider
CC Noreen Rucinski
FAXED    8/15/94    1-305-558-2058                           1                    Customer Initials: _____

COMPUTERIZED MEDICAL CONSULTANT
SERVICES AND COMMISSION/FEES
AGREEMENT

## 5. CHARGES AND PAYMENT:

5.1 Charges for the DME's to the Facilities shall be determined according to the CMC's allowable rates.

5.2 Recurring charges shall be invoiced by CMC on a monthly basis in advance and non-recurring charges shall be invoiced in arrears. At no time my IFIP bill for any reasons or it will result in breach of contract for fees per month. All payments to associates will be paid by IFIP when paid by CMC.

5.3 CMC may collect from IFIP any and all commissions, but not fees at its option, either against the last month of charges due hereunder prior to termination of this Agreement, or against any other amounts owing to CMC under this Agreement.

5.4 All disputes or requests for billing adjustments must be submitted in writing and submitted with payment of undisputed amounts due. Any amounts which are determined by CMC to be in error or not in compliance with this Agreement shall be adjusted on the next month's invoice (this may take up to six months to determine billing with government agencies). Any disputed amounts which are deemed by CMC to be correct as billed and in compliance with this Agreement, these disputes shall be payable by CMC to all authorized representatives until refunds and rebilling is done upon notification and demand by CMC. (Up till 12 months after billing). Disputes shall not be cause for CMC to delay payment to representative pursuant to fees in lieu of commissions. According to the terms outlined in Section 5.3 above. Any applicable federal, state, or local taxes, and all use, sales, commercial, gross receipts, privilege or other similar taxes or license fees, whether charged to or against CMC or Patient, with respect to the Facilities provided by CMC, as well as any other imposition by any governmental authority which has the effect of increasing CMC's cost of providing the Facilities, shall be payable by Agencies in addition to the other charges set forth in this Agreement.

## 6. REMEDIES FOLLOWING DEFAULT:

6.1 If CMC is in Default, IFIP may, in addition to any other remedies it has under this Agreement or under the law: (a) suspend its performance under this Agreement without the requirement of any further notice to CMC, until CMC has remedied all breaches of this Agreement and paid in full all charges then due, including any late fees specified herein; (b) make further provision of Facilities or acceptance of a Service Order conditional upon Customer's assurance of payment and compliance with this Agreement, or (c) terminate this Agreement by giving written notice to IFIP in the manner provided in Section 8.2 of this Agreement.

6.2 If CMC is in Default, IFIP may, in addition to any other remedies it has under this Agreement or under the law, terminate this Agreement in the manner provided for in Section 8.1 of this Agreement, but may not withhold or suspend its own performance.

## 7. TERMINATION:

7 CMC may terminate this Agreement: (a) effective upon written notice to Patient, (i) CMC will not terminate or release this month to month agreement that is billed for 12 months following the first order. Fees will stay in place for services to CMC for the period of 6 months following termination of patient.

## 7. GOVERNMENTAL AUTHORITY:

8. CMC acknowledges that it is the obligation of CMC to provide the Facilities to Patient and is subject to the receipt by Patient of any required regulatory or other governmental authorizations. This Agreement may be superseded by filings with the appropriate government agency, which may contain such modifications of the provisions of this Agreement, as CMC deems appropriate, all of which shall become

Confidential and Proprietary

Jerome Schneider
CC Noreen Rucinski
FAXED    8/15/94    1-305-558-2058                    2                    Customer Initials: _____

COMPUTERIZED MEDICAL CONSULTANT
SERVICES AND COMMISSION/FEES
AGREEMENT

automatically binding on Patient. CMC reserves the right to terminate this Agreement pursuant to Section 8 of this Agreement if at any time it loses the required regulatory or other governmental authorizations to provide to the Facilities.

8.2   CMC represents and warrants that: (a) CMC has received all necessary permits, licenses, approvals, grants, and charters of whatsoever kind necessary to carry out the business in which patient requires and or is engaged for; and (b) CMC has complied and does comply with all laws, regulations, orders, and statutes which may be applicable to Patient, whether local, State or Federal. From the date of this Agreement until the termination hereof, CMC agrees to operate in accordance with and to maintain current all such certifications, permits, licenses, approvals, grants, charters, and to comply with all applicable laws, regulations, orders and statutes, whether local, State or Federal. A breach by CMC is solely the responsibility of CMC, any of the representations, warranties or covenants of this Section 9.2 shall be deemed a Default hereunder, and shall allow IFIP and associates to terminate this Agreement in the manner described in Section 8.2 of this Agreement.

9.   **FORCE MAJEURE**:

9.1   Except as is provided in Section 10.2 below, IFIP shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including, but not limited to: acts of God, fire, explosion, vandalism, any law, order, regulation, direction, action or request of the United States government, or of any other government, including state and local governments having jurisdiction over either of the parties, or of any department, agency, commission, court, bureau, corporation or other instrumentality of any one or more said governments, or of any civil or military authority; national emergencies, insurrections, riots, wars, or strikes, lock-outs, work stoppages or other labor difficulties; actions or inactions of a third party provider or operator of facilities employed in provision of the Facilities; or any other conditions or circumstances beyond the reasonable control of CMC.

9.2   If any failure of performance on the part of CMC described in Section 9.1 of this Agreement shall be: (a) for hundred twenty days (120) calendar days or less, then this Agreement shall remain in effect, but patient shall be relieved of its obligation to pay for that portion of the Facilities affected for the period of such failure of performance; or (b) for more than six month, then CMC may terminate only that portion of any Service Order or Service Orders related to the Facilities so affected, by written notice in accordance with Section 8.3 of this Agreement.

10.   **ASSIGNMENT**:
10.   Neither this Agreement nor any of Patient's rights or obligations hereunder may be sold, assigned, sublet, encumbered or transferred by operation of law or otherwise (hereafter, a "**Transfer**"), without the prior written consent of CMC. Any Transfer by Customer without CMC prior written consent shall entitle CMC, at its option, to: (a) consider the Transfer void; (b) consent to the Transfer, and hold the Customer and any transferee(s) liable hereunder; or (c) terminate this Agreement upon delivering written notice to Customer. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and there respective successors or assigns. CMC may transfer, assign, or otherwise in any manner encumber this Agreement and its rights and obligations hereunder without the need to obtain IFIP's prior consent.

11.   **TITLE**:

11.1   Patient expressly disclaims any right, title, perpetual right of use or any other interest in or to any equipment or property used that is supplied by CMC under this Agreement.

12.   **WARRANTIES AND LIMITATION OF LIABILITY**:

Confidential and Proprietary

Jerome Schneider
CC Noreen Rucinski
FAXED   8/15/94   1-305-558-2058                3              Customer Initials: _____

COMPUTERIZED MEDICAL CONSULTANT
SERVICES AND COMMISSION/FEES
AGREEMENT

12.1    CMC warrants that the services to Facilities shall be provided to Patient and shall operate in accordance with prevailing industry standards (hereinafter the "Medical Standards"). If CMC determines that the Facilities are not being provided in accordance with the Standards (hereinafter, a **"Defect"** or **"Defects"**), CMC shall use reasonable efforts under the circumstances to conform the Facilities to the Standards.

13.1    THE WARRANTIES CONTAINED IN SECTION 14.1 OF THIS AGREEMENT ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CMC HEREBY's SPECIFICALLY DISCLAIMS ANY LIABILITY TO IFIP FOR ANYTHING AFFECTING THE FACILITIES FURNISHED HEREUNDER WHICH ARE ATTRIBUTABLE TO PATINET'S DME'S TO THE FACILITIES (AS DEFINED IN SECTION 1.4 OF THE SERVICE EXHIBIT) OR TO PATIENTS.

13.2    IN NO EVENT SHALL IFIP OR ANY OF ITS AFFILIATES BE LIABLE TO PATIENT OR ANY OF ITS AFFILIATES OR EMPLOYEES OR TO ANY THIRD PARTY FOR: (a) ANY LOSS OF PROFIT OR REVENUE, OR FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR SIMILAR OR ADDITIONAL DAMAGES, WHETHER INCURRED OR SUFFERED AS A RESULT OF UNAVAILABILITY OF FACILITIES, PERFORMANCE, NON-PERFORMANCE, TERMINATION, BREACH, OR OTHER ACTION OR INACTION UNDER THIS AGREEMENT, OR FOR ANY OTHER REASON, EVEN IF PATIENT ADVISES CMC OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR (b) FOR ANY LOSS OR INCORRECT BILLING OR DEFECTIVE TRANSMISSIONS, OR ANY DIRECT OR INDIRECT CONSEQUENCES THEREOF, EXCEPT AS IS SPECIFICALLY PROVIDED IN SECTION 5 OF THE SERVICE EXHIBIT REGARDING OUTAGE CREDITS.

**14.**    <u>**NON-DISCLOSURE AND PUBLICITY**</u>:

14.1    CMC shall not disclose to IFIP and to any third party the terms and conditions of this Agreement without the prior written consent of the agencies that is acquires it from. IFIP shall not use CMCs name in publicity or press releases without obtaining CMC's prior written approval, which shall not be unreasonably withheld.

**15.**    <u>**ARBITRATION**</u>:

15.1    All disputes relative to those aspects of the Facilities which involve amounts reasonably anticipated to be in excess of Twenty-Five Thousand Dollars ($25,000.00) arising out of or related to this Agreement, shall be determined and resolved by arbitration in Florida, in accordance with the rules of the American Arbitration Association ("**AAA**"). The arbitrators shall be appointed in accordance with the rules then prevailing of the AAA.

15.2    The award rendered by the arbitrator(s) shall be final and binding upon the parties hereto. Neither party shall have the right to further appeal or redress the matters arbitrated except for the purposes of obtaining the judgment rendered by the arbitrator(s). Judgment upon any arbitration award may be entered and enforced in any court of competent jurisdiction.

15.3    The parties hereto agree that a prevailing party shall be entitled to recover all reasonable costs and expenses (including all reasonable attorney's fees and disbursements) of such arbitration proceeding, as well as all cost for said proceeding. Such prevailing party shall also be entitled to reasonable attorney's fees and costs incurred in enforcing a judgment of the arbitrators separately from and in addition to any other amount included in such judgment. This Section 16.3 shall be severable from the other provisions of this Agreement and shall survive and not be merged into any such judgment.

Confidential and Proprietary

Jerome Schneider
CC Noreen Rucinski                                                               Customer Initials: _____
FAXED    8/15/94   1-305-558-2058          4

COMPUTERIZED MEDICAL CONSULTANT
SERVICES AND COMMISSION/FEES
AGREEMENT

## 16.    MISCELLANEOUS:

16.1    **IFIP** shall execute such other documents, provide such information and cooperate with CMC, all as may be reasonably required by CMC in connection with providing the Facilities.

16.2    Neither this Agreement, nor the provision of Facilities hereunder, shall create a partnership or joint venture between the parties or result in a joint service offering to any third parties.

16.3    The failure of either party to give notice of default or to enforce or insist upon compliance with any of the terms or conditions of this Agreement shall not constitute a waiver of any term or condition of this Agreement.

16.4    No subsequent agreement concerning the Facilities or modification to this Agreement shall be binding upon the parties unless it is made in writing by an authorized Patient and of CMC.

16.5    If any part of any provision of this Agreement shall be invalid or unenforceable under applicable law, said part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of said provision or the remaining provisions of this Agreement, and CMC agrees to negotiate with respect to any such invalid or unenforceable part to the extent necessary to render such part valid and enforceable.

16.6    The terms and provisions contained in this Agreement that by their sense and context are intended to survive the performance thereof by the parties hereto shall survive the completion of performance and termination of this Agreement, including, without limitation, the making of any and all payments due hereunder.

16.7    All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be given by:  (a) hand delivery; (b) first-class registered or certified mail with postage prepaid; (c) overnight receipted courier service; or (d) telephonically confirmed facsimile transmission, which notice is addressed to the party at the address set forth below, or such other address as may hereafter be designated in writing by the party.  Notices given in accordance with this Section shall be effective upon receipt or when receipt is refused.

16.8    This Agreement comprises the complete and exclusive statement of the agreement of the parties concerning the subject matter hereof, and supersedes all previous statements, representations, and agreements concerning the subject matter hereof.

DATED as of the first date above written.
CUSTOMER:
By:____Computerized Medical Consultants____          By      Noreen Rucinski

Name: Jerry Schneider                          Date:____August 15 1994_____
                                               **Noreen Rucinski for IFIP**

Confidential and Proprietary

Jerome Schneider
CC Noreen Rucinski                                          Customer Initials:  _____
FAXED    8/15/94    1-305-558-2058                 5

# AGENT AGREEMENT

This Agreement, (the "Agreement"), is entered into on this, the August day of _15_, 1994 by and between. Computerized Medical Consultants, ("Supplier"), and Noreen Rucinski IFIP_, ("Agent").

## RECITALS

WHEREAS, Supplier is in the business of providing DME supplies and community services.

WHEREAS, Agent wishes to act as an independent contractor to secure new patients for CMC;

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows;

I.

## APPOINTMENT AND COMPENSATION

CMC hereby appoints Agent to act as an independent contractor to secure Patients for CMC. Agent agrees to assist and cooperate in good faith with CMC to try and keep the Patient's account with CMC both during the term of Patients initial contract with CMC, and any extensions thereof. CMC shall pay to Agent a fee and or plus a commission for accepted orders pursuant the commission schedule attached hereto and made a part hereof as Exhibit "A", so long as any Patient obtained for CMC by Agent remains a Patient of CMC, including any extension or renewals. CMC shall pay fees and or commissions to Agent on monthly billed and collected Patient invoices for the services used. Commissions shall not be paid for any charge on the bill to patient other than for services (i.e. no commission will be paid on taxes, fees, charge, etc...). No Patient order procured by Agent shall be binding until accepted in writing by both CMC and the Patient through execution of CMC's and current Patient's doctor, and may be modified by CMC from time to time. CMC reserves the right to reject any order and to cancel any Patient for any reason at any time. If CMC does not accept in writing an order submitted by Agent within sixty (60) days of receipt thereof, then such order shall be deemed rejected by CMC.

Upon obtaining a bona fide Patient lead, Agent shall fill in forms notify CMC in writing of the name of the potential Patient and provide in such notice the name, telephone number, and address of the contact persons with Patient (doctor), Agent's assigned agent number, if any, and such other and further information reasonably requested by CMC. Upon CMC's receipt of the Patient forms from Agent CMC shall not circumvent Agent as to that Patient. Agent agrees and understands that, in addition to his/her efforts, that CMC will have other sales agents as well as IFIP's associates soliciting Patient accounts, and that CMC will be soliciting Patient accounts on its own. Unless otherwise agreed in writing by CMC and Agent, if a conflict arises as to who brought a Patient to CMC, the date of the earliest Patient forms received by CMC shall determine which sales agent or entity gets credit for the Patient.

I.

## INDEPENDENT AGENT

It is expressly understood and agreed that Agent/ and associates shall operate pursuant to the terms of this Agreement as a non-exclusive independent Agent for CMC and shall not be construed to be an employee of CMC. Agent has no authority to enter into any contract or incur any liability on behalf of CMC. If CMC accepts a Patient contract as a result of Agent's activities, CMC agrees to indemnify and hold Agent harmless from any loss, suit, claim, damage, or fine arising from or out of CMC's dealing with such Patient.

III.

## TAXES/EXPENSES

Agent shall be responsible for any and all taxes and expenses incurred by Agent.

IV.

## CONFIDENTIALITY/NON-DISCLOSURE

Agent shall keep all proprietary information, designated in writing to Agent by CMC, confidential, and shall not disclose any such information to any third party without the express written consent of CMC. Agent shall maintain in confidence such information during the term of this Agreement.

V.

## TERM

The term of this Agreement shall be for six (6) months, commencing on the date of this Agreement, unless extended by the mutual consent of the parties.

EXHIBIT "D-2"

VI.
WARRANTIES

Agent acknowledges that it is not authorized to make, and will not make, any warranties, expressed or implied, to the Patients which are binding, on CMC.

VII.
ASSIGNMENT

Agent shall not assign or transfer this Agreement or any rights hereunder without the prior written consent of CMC.  Agent's delegation of its duties or obligations to its employees shall not be construed as an assignment of this Agreement.

VIII.
POST TERMINATION COMMISSIONS

CMC's obligation to pay fees or commissions to Agent for on-going services to Patients secured by Agent during the term of this Agreement shall survive termination of this Agreement and shall run through the end of the then current contract term with the Patient or any extensions or renewals thereof. Should services stop, the monthly fee of $3,500.00 to agent and to all associates will be paid for 3-6 months following last payment of patient's services. Evaluation will be determined at the true up at 90 days and fees over paid will be returned to CMC or decided by CMC only upon evaluation.

IX.
NOTICE

Any notice or payment permitted or required by this Agreement shall be delivered in one of the following methods:  (1) certified mail return receipt requested; (2) overnight mail via Federal Express or United Parcel Service; (3) a facsimile transmission for which the sending party obtains a confirmed receipt; or (4) hand delivery.  Notice shall be addressed as follows, or to such other person and address as either party may subsequently designate in writing:

If to CMC:          Computerized Medical Consultants

If to Agent:        _Noreen Rucinski_____


                    Telephone:  ___619-282-7977_____

                    Facsimile:  _____

X.
MISCELLANEOUS

A.    Entire Agreement:  This Agreement shall be binding upon the parties when it has been executed in their behalf by their duly authorized agents and both approval signatures below have been obtained.  When executed, this Agreement shall supersede all previous agreements between the parties as to the matters contained herein and all transactions between the parties shall be governed exclusively by the provisions of this Agreement.  No change in this Agreement shall be binding unless made in writing and signed by the parties.  Agent acknowledges that is has read this Agreement, understands it, and agrees to be bound by its terms and conditions.

B.    Legal Expenses:  If either party to this Agreement commences a legal action to enforce its rights under this Agreement, the prevailing party in such action shall be entitled to recover from the non-prevailing party, its costs and expenses incurred in such action, including reasonable attorney's fees.

C.    Venue/Choice of Laws:  This Agreement and all questions as to its interpretations, performance, and enforcement and the rights and remedies of the parties arising hereunder or otherwise relating thereto shall be determined in accordance with the laws of the State of Florida, and that venue for any action or proceeding arising from directly or indirectly from or out of this Agreement shall be Miami/Dade County/ FL.

D.    Binding Effect:  Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their principals and

stockholders and their respective heirs, successors, assigns, executors, personal representatives and administrators.

       E.    Severability:  If one or more of the provisions contained in this Agreement or in any document contemplated hereby, or any application hereof, shall be held to be invalid, illegal or unenforceable, in any respect, the validity, legality and enforceability of the remaining provision contained herein and therein, and any application thereof, shall not in any way be affected or impaired, but the Agreement shall be construed as if such provision were not a part of this Agreement.  If any ambiguity is contained herein then in resolving such ambiguity no weight shall be given in favor of or against either party solely on accounts of its drafting this Agreement.

      Executed this __15_____ day of _AUGUST_____, 1994.

**CMC:**    **Computerized Medical Consultants**    **Agent:**   _Noreen Rucinski_____

| | |
|---|---|
| _____ | _____ |
| Signature | Signature |
| _Jerome Schneider _____ | ____Noreen Rucinski_____ |
| Printed Name | Printed Name |
| ___President _____ | _____N/A_____ |
| Title | Title |

## AGENT AGREEMENT

### EXHIBIT A

Agent will be paid on a monthly basis as follows:

- Commission and or fees are a minimum of $1.00 per unit or $3,500 month to agent and associates in lieu of all billed services for each Patient account brought to CMC.  Agent will supply forms in writing to CMC prior to CMC's execution of the contract based the amount of the units declared from the doctors.

- Commissions/fees are to be paid as follows:

  $1.00 per unit or no less than $3,500.00 per month and will be paid within 120 days of invoice date on billed revenues by CMC.
  The remaining amount will be trued-up and paid to Agent within ninety days (90) days from receipt of balance of payment from Patient for the billed month.

- CMC should include a report detailing the billing of the Agents Patients with commission/ payments including invoice summary copies et al. And reveal the calculations involved in arriving at the commission amount.

INITIALS:

Authorized Representative of CMC: _____

Authorized Representative of Agent: _NBSR_____